Joseph K. Ebert and Madge Irene Ebert, complainants-respondents,

*v.*

John A. Givas and Belmar Natatorium, Incorporated, a corporation, defendants-appellants.

[Submitted October term, 1931. Decided February 1st, 1932.]

*Mr. T. Mancusi Ungaro (Mr. Herbert A. Kuvin,* of counsel), for the complainants-respondents.

*Mr. James F. X. O'Brien,* for the defendants-appellants.

The opinion of the court was delivered by

Case, J.

This is an appeal by the defendants from a decree in chancery directing them to surrender a lease of bathing pool lands at Belmar to the complainants and declaring the lease null and void. The bill of complaint alleged that title to the lands was in the complainants, husband and wife; that the complainants and the defendant Givas agreed to form a corporation to be known as the "Belmar Swimming Pool Corporation," and retained an attorney to attend to the incorporation and to draw a lease for the premises from the complainants to the corporation; that the lease was actually made to Givas instead of to the corporation and that this was done in reliance upon Givas' fraudulent representation that the reason for this variation from the agreement was to

fix value for the stock to be given Givas for his services in promoting the corporation; and that later Givas fraudulently assigned the lease to Belmar Natatorium, Incorporated, a newly formed corporation. The decree determined that the lease "was signed, executed and delivered to the lessee therein through the fraudulent representations of the defendant John A. Givas, as set forth in the bill of complaint filed herein; that the lease was obtained from the complainants by the fraud and imposition of the defendant John A. Givas."

The issue is whether there was fraud at the inception of the lease. Relief specifically against the subsequent assignment or by an assignment to Belmar Swimming Pool Corporation was neither sought nor granted. The Belmar Swimming Pool Corporation is not a party to the suit.

Ebert had spent much, and Givas a little, money in the acquisition of the land, and Givas had devoted considerable time to various efforts preliminary to the project. The Eberts and Givas came together on January 17th, 1930, to consummate their arrangements, which was to incorporate a company and make a lease running from the Eberts to it. Their attorney, Apostolakos, who had been engaged to attend to the legal business, was also present and produced the articles of incorporation of the Belmar Swimming Pool Corporation for signature and at the same time a form of lease drawn, not to the corporation, but to Givas personally. It is to be gathered from the evidence that stock of the corporation was to have been issued without tangible assets. The attorney, at the meeting, advised his clients that the better way was to have Givas refrain from being an incorporator, let the Eberts make the lease to him as to a third party, and after a substantial period should have elapsed, have Givas assign the lease to the corporation in consideration of the issue of corporate stock, thus obtaining asset value for the stock which might then be divided between the parties in such proportion as they should determine. Whether the scheme was adequate for its purpose is not in question. That was the plan. The Eberts were fully aware of it and were

parties to it. Apostolakos, a witness for complainants, so testified and the Eberts themselves gave evidence in similar vein. The scheme was entered upon no more for the advantage of Givas than for the advantage of Mr. and Mrs. Ebert. There is no evidence that Givas, by word or act, influenced the situation or that he made any representations, true or false. Mr. Ebert testified that the suggestion for the change of arrangement and the explanation thereof were made by Apostolakos and that "Givas never spoke that night on anything connected with it. He was present, made no comments." Apostolakos testified to like effect. The Eberts and Givas then signed the lease, and the Eberts and another person signed the articles of incorporation. The incorporation papers were not filed at the secretary of state's office until March 24th, but no responsibility for the delay is imputed to Givas.

Sometime after March 3d a dispute arose between Ebert and Givas as to the proportions in which the corporate stock should be divided and the persons to whom it should be issued. The merits of that dispute need not be discussed further than to say that Givas' demand that one-half of the stock to be issued in consideration of the assignment of the lease should be issued to him does not seem so unreasonable as to constitute proof of an original fraudulent purpose. It is true that the cost of the property to the Eberts was between $71,000 and $75,000. But, by the lease, the ownership remained in the Eberts subject only to an option in the lessee to purchase the fee at a price graded from $100,000 during the earlier years of the term to $175,000 during the later period, and there was reserved a yearly rental beginning at $5,000 and gradually increased to $10,500. In addition to the rental the lessee was required by the provisions of the lease to pay all municipal, county, state and federal taxes and assessments against the property, all water charges, and the fire and liability insurance premiums. After the disagreement Givas formed a new corporation, the defendant Belmar Natatorium, Incorporated, and assigned the lease to it.

The complainants contend that the proofs conclusively show by the preponderance of the credible testimony that the defendant Givas procured the lease from the complainants by a false statement of his existing intention. We think that the proofs quite conclusively demonstrate the contrary. There is no proof of a statement, false or otherwise, made by Givas at, before or subsequent to execution and delivery of the lease regarding his intention at or prior to the time of such execution and delivery. The allegation of the bill in this respect is without support. The fraud must be in the original transaction or contract, not in the non-fulfillment of the contract. There is no proof from any source of misrepresentation or of the existence of a wrongful intent on or before January 17th unless the later assignment to the corporate defendant be so considered; and of this, presently.

Complainants further contend that the opportunity of the vice-chancellor to observe the witnesses in person is sufficient ground for sustaining certain of his oral observations, among which is the following: "Ebert was induced to sign this lease by the fraudulent representation that if he did sign it, it would be turned over to the Belmar swimming, and the very fact that he did not turn it over to the Belmar swimming shows the fraud at the inception of the lease." We interpret these and similar words as running comments and not as formal findings of fact, but, however they be classified, we are not in accord with them. We have already spoken of the positive testimony given by the Eberts that Givas made no representation; and, in the light of all the circumstances, we are unable to read Givas' later act in assigning the lease to his co-defendant as convincing evidence of a fraudulent purpose at the inception of the lease. Fraud must be clearly proved. *Firemen's Fund Insurance Co.* v. *Nicholson; 103 N. J. Eq. 32; affirmed, Ibid. 375.* It was not so proved in the instant case.

The complainants were not victims of either misrepresentation or mistake in the execution and delivery of the lease. The case hung on an affirmative statement of that proposition and falls with it.

Our conclusion is that the decree below should be reversed.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DALY, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, KERNEY, JJ. 15.